***********
The undersigned have reviewed the prior Opinion and Award based on the record of the proceedings before Deputy Commissioner Jones and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which was entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between the plaintiff and the defendant-employer.
3. The defendant-employer is a duly self-insured.
4. A Form 22 was submitted from which an average weekly wage may be determined.
5. The plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 1.
6. The plaintiff's recorded statement was stipulated into evidence as Stipulated Exhibit 2.
7. Industrial Commission filings in this case were stipulated into evidence as Stipulated Exhibit 3.
8. The issues before the undersigned are: (i) whether the plaintiff developed occupational diseases arising out of and in the course his employment with the defendant-employer; and (ii) if so, what compensation, if any, is due the plaintiff?
 ***********
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing, the plaintiff was fifty-eight (58) years old. The plaintiff had obtained a bachelor of science in sociology at the University of Memphis in 1965. After working as a social worker for several years, the plaintiff went to graduate school at the University of Memphis to obtain his masters degree in History. The plaintiff obtained his Ph.D. in History in 1987 at Duke University.
2. The plaintiff taught on a contractual basis at several area educational institutions including Durham Tech, Elon College, and Alamance Community College after receiving his doctorate.
3. In 1993, the plaintiff was offered a position in the History Department at North Carolina Central University. This position was a temporary, part-time contract position. Through his entire employment with the defendant, the plaintiff was the only Caucasian member of the History department.
4. The plaintiff eventually was offered and accepted a full-time contract position.
5. The plaintiff continued to teach on fixed term contracts at North Carolina Central University. During the plaintiff's second year he was given an assignment to supervise two honor societies.
6. During this supervision the plaintiff discovered and reported what he judged to be past financial abuses by the faculty previously advising the honor societies. This was the first of several incidents that caused perceived hostility toward the plaintiff from his fellow History professors.
7. In the spring semester of the plaintiff's second year of employment with the defendant, the plaintiff was assigned by Dr. Sylvia Jacobs, Chairperson of the History Department, to take over a set of classes previously assigned to Professor Fortune. The plaintiff perceived that the other History professors resented the plaintiff for taking over the classes of Professor Fortune. Due to the increasingly difficult situation, the plaintiff claims to have attempted to apply for other positions, but that Dr. Jacobs refused to write him a letter of recommendation and insisted that he stay in the defendant's History department on a contract basis.
8. Despite the plaintiff's supposed difficulties in the department, the plaintiff was offered and accepted a full-time permanent position in the fall of 1996. The plaintiff claimed that the faculty continually harassed him after he attained that position. He claims he was not made aware of meetings and position papers, that he wasn't given proper equipment, and that Professor Carlton Wilson deprived him of normal telephone access. There is no evidence that plaintiff was treated any differently than his coequals in these matters.
9. In 1998, the plaintiff responded to a classified advertisement for a tenure track position with the defendant. The plaintiff was offered an interview with Dr. Jacobs and the faculty committee in April 1998. The plaintiff testified that on the morning of the interview, a nail was in the plaintiff's car tire and he was late for the interview. The plaintiff claims that his peers on the committee objected to him being offered the position due to personal animosity. There was no evidence presented that plaintiff was in any way intimidated or prevented from interviewing for that position.
10. Despite the supposed prejudice against the plaintiff, the plaintiff was offered the tenure track position.
11. A year after Dr. Jacobs had named the plaintiff to the tenure track position, the tenure committee voted not to reappoint the plaintiff. The plaintiff appealed the decision to the University Chancellor, who ultimately reversed the decision of the tenure committee and reappointed plaintiff into the tenure track position.
12. All professors on a tenure track are subject to periodic review of their progress. Many professors who are on a tenure track do not attain tenure.
13. In the fall of 1998, the tenure committee denied the plaintiff's reappointment. The plaintiff again appealed this decision but this ruling was not overturned.
14. According to the plaintiff, during a faculty meeting in September of 1998 there was a near-altercation. The plaintiff testified that Dr. Percy Murray intimidated the plaintiff with the threat of physical violence. The greater weight of the evidence does not corroborate plaintiff's version of this event.
15. The plaintiff returned to work at North Carolina Central University in January 1999 following surgery on his carotid artery. Despite all of his perceived problems within the department, the plaintiff returned to the defendant on a contract basis.
The plaintiff left employment during April of 1999.
The plaintiff claims that the treatment his colleagues subjected him to and the related career setbacks caused him depression, anxiety, sleeplessness, and "fits of rage."
The medical testimony in the record does not establish that the plaintiff was placed by his employment with the defendant at a higher risk for depression, post traumatic stress disorder, anxiety, sleeplessness, or any other mental affliction.
The medical testimony in the record does not establish that the plaintiff's employment with the defendant caused the plaintiff any depression, post traumatic stress disorder, anxiety, sleeplessness, or any other mental affliction.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. There is insufficient evidence of record from which to determine by its greater weight that the plaintiff's employment with the defendant as a History professor placed the plaintiff at an increased risk of developing, or caused the development of, depression, post traumatic stress disorder, anxiety, sleeplessness, or any other mental affliction. N.C.G.S. § 97-53 (13).
2. The plaintiff has no disease and no disability related to causes and conditions which are characteristic of and peculiar to the plaintiff's employment with the defendant-employer. N.C.G.S. § 97-53(13).
3. The plaintiff is entitled to no compensation under the provisions of the North Carolina Worker's Compensation Act. N.C.G.S. § 97-53.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Under the law, the plaintiff's claim must be, and hereby is, DENIED.
2. Each side shall pay their own costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER